UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DANIEL A TROYA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00162-JRS-DLP |
| | ) | |
| WILLIAMS E WILSON MD/CD, | ) | |
| MICHAEL RUMSKA HSA, | ) | |
| HEATHER MATA PA-C, | ) | |
| SUSAN PORTER RN, | ) | |
| CINDY MCGEE NR-P, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Motion for Summary Judgment and
Directing Entry of Final Judgment**

Plaintiff Daniel A. Troya is a federal inmate currently incarcerated in the Special
Confinement Unit (SCU) of the Federal Correctional Complex in Terre Haute, Indiana ("FCC
TH"). On April 10, 2017, Mr. Troya filed this action again various FCC TH employees, including
Dr. William Wilson, Andrew Rupska[1], Heather Mata, Susan Porter, and Cindy McGee, alleging
that, in violation of the Eighth Amendment, the defendants were deliberately indifferent to his
serious medical needs from constipation after his hemorrhoidectomy in April 2016.[2] Mr. Troya's
action is brought pursuant to the theory recognized in *Bivens v. Six Unknown Named Agents*, 403
U.S. 388 (1971).

Presently pending before the Court is the defendants' motion for summary judgment. For
the reasons explained below, the motion for summary judgment, dkt. [72], is **granted**.

---

[1] Andrew Rupska is identified as "Michael Rumska" in the complaint. The difference in name is not
material and does not affect Mr. Troya's claim against Mr. Rupska.

[2] Mr. Troya also brought a claim against Nurse John Doe, but the Court dismissed the claim against John
Doe when it screened Mr. Troya's complaint. *See* dkt. 5 at 5.

## I.      Summary Judgment Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them.  *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017).

## II.      General Comments about the Parties' Briefing

The parties raise several concerns in their respective briefing that the Court will address separately here.  Issues related to factual disputes possibly precluding summary judgment are discussed in the Factual Background, Section III, below.

On July 13, 2018, the defendants filed a motion for summary judgment. Dkt. 72. In support, they included testimony from Mr. Troya from his March 12, 2018, deposition. *See* dkt. 72-1.

On October 4, 2018, Mr. Troya filed his response in opposition. Dkt. 86. Mr. Troya included affidavits from two other inmates, Leamond C. Mitchell, dkt. 86-1, and Wesley I. Purkey, dkt. 86-2, and himself, dkt. 86-3. Mr. Troya also requested that the Court strike all references to his deposition because he was denied counsel to represent him in the deposition. He also felt threatened by the defendants' counsel's questions, was in a lot of distress, and suffered from a lack of sleep the day of his deposition. *See* dkt. 86 at 31; dkt. 86-3 at 1.

In reply, the defendants argue that the Court should not consider the declarations of Mitchell and Purkey because they were not disclosed as witnesses. Dkt. 89 at 2-5. The defendants also ask that the Court consider Mr. Troya's deposition and credit it over any contradictory statements in his declaration or verified Complaint. *Id.* at 5-7.

In his surreply, Mr. Troya argues that the defendants' reply brief should be stricken in its entirety because it is over the page limit by 10 pages, his affidavits are appropriate, the disclosure of witnesses does not apply to him because of *Fed. R. Civ. P.* 26(a)(1)(B), and his deposition testimony should be stricken in its entirety.

### A.     Reply Brief Page Limit

Mr. Troya argues that the defendants' reply brief should be stricken in its entirety because it is over the page limit by 10 pages. Dkt. 90 at 1-2. Mr. Troya is mistaken. Defendants' reply brief is 20 pages, which is within the limits set by Local Rule 7-1(e). *See* dkt. 89.

## B.  Disclosure of Witnesses

Regarding the disclosure of witnesses, on September 12, 2017, the Court issued a Pretrial Schedule that required the parties to exchange a list of potential witnesses.  *See* dkt. 26 at 1.  That list was to be updated as needed and the Court specifically noted that a party may be prevented "from using evidence that it has not shared with the other side."  *Id.* at 2.  On at least two occasions—including, for example, an actual "Disclosure Pursuant to F.R.Civ.P. 26(a)(1) and (2) (dkt. 89-1)—Mr. Troya disclosed a witness list, but failed to identify Mitchell or Purkey.  Because Mitchell and Purkey were never disclosed as witnesses to the defendants, the defendants argue that the Court should not consider their declarations.  Despite having previously disclosed witnesses in compliance with *Fed. R. Civ. P.* 26(a)(1)(A), (dkt. 89-1), Mr. Troya argues that he is exempt from disclosing witnesses because *Fed. R. Civ. P.* 26(a)(1)(B) exempts actions filed by *pro se* inmates from initial disclosures.  *See* dkt. 90 at 2-3.

*Fed. R. Civ. P.* 26(a)(1)(B) provides that in actions filed by *pro se* inmates, the initial disclosure requirements set forth in *Fed. R. Civ. P.* 26(a)(1)(A) do not apply.  However, although Mr. Troya is proceeding *pro se*, he must still comply with Court orders.  *See McMasters v. United States*, 260 F.3d 814, 818 (7th Cir. 2001); *McNeil v. United States*, 508 U.S. 106, 113 (1993) ("We have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.").  The Court's Pretrial Schedule made clear that the parties were to exchange a list of potential witnesses and to update the list as needed.  Yet, as noted above, although Mr. Troya has on several occasions previously disclosed witness lists, he did not specify Mitchell or Purkey in those disclosures.  If a party fails to disclose a witness as required, that "party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  *Fed.*

*R. Civ. P.* 37(c)(1). Mr. Troya, and not the defendants, carries the burden of showing his non-disclosure was either substantially justified or harmless. *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir. 1996).[3]

Mr. Troya has set forth no justification for the failure to disclose. The Court notes that the failure to disclose Purkey as a fact witness may be considered harmless because the defendants knew that Purkey was providing substantial assistance to Mr. Troya, including preparing Mr. Troya's complaint. However, paragraphs 1-6, 8-10 of Purkey's declaration and certain exhibits relate to health problems Purkey experienced in July and August 2018, unrelated to Mr. Troya's complaints. *See* dkt. 86-2 at 1-5, 8-12. The Court takes judicial notice that Wesley Purkey has incurred three "strikes" within the meaning of 28 U.S.C. § 1915(g), and therefore Purkey is unable to proceed *in forma pauperis* in his own actions in this Court. *Purkey v. Marbery et al.*, No. 09-1843 (7th Cir. Jan. 15, 2010). Mr. Purkey cannot piggyback onto Mr. Troya's litigation to present his own medical care claims. Because paragraphs 1-6 and 8-10 of Purkey's declarations are irrelevant and do not present facts "of consequence in determining the action," pursuant to *Fed. R. Evid.* 401, the Court will not consider those paragraphs of Purkey's declarations. Moreover, the Court will not consider Mitchell's declaration because Mitchell was not properly disclosed as a witness to the defendants.

## C.      Mr. Troya's Deposition Testimony

Mr. Troya requests that the Court strike his deposition testimony in its entirety "because he was denied counsel to represent him during such proceedings, and because of the acute stress

---

[3] Mr. Troya argues that the defendants were required to demonstrate prejudice from the failure to identify the witnesses. Dkt. 90 at 3 (citing *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216 (D. Kan. 2007)). However, Mr. Troya is mistaken. *Wilkins*, which is not binding authority on this Court in any case, held that "[a] court, however, may treat the failure to disclose witness information as harmless 'if the other party was well aware of the identity of the undisclosed witness and the scope of their relevant knowledge well before trial.'" *Id.* at 1224.

and dis[]tress he was under at that time." Dkt. 90 at 5. He also alleges he felt threatened by the defendants' counsel. Despite his request, he requests that the Court should "use 'a scalpe[l], not a butcher knife.'" *Id.* at 6. But Mr. Troya may not ignore his prior testimony simply because he now regrets those answers.

Litigants in federal civil cases do not have a constitutional or statutory right to court-appointed counsel. *Walker v. Price*, 900 F.3d 933, 938 (7th Cir. 2018). Moreover, the Court has repeatedly found Mr. Troya to be competent, noting the quality of his legal filings. *See, e.g.*, Dkt. 84. Thus, the lack of counsel during his deposition does not preclude his ability to testify truthfully regarding his knowledge in a deposition.

Mr. Troya argues that he felt threatened by the defendants' counsel's questions about the manila folder he brought to the deposition. Dkt. 86-3 at 1. He states that at the inception of the deposition, Ms. Shields, defendants' counsel, stated "I would like to see the legal materials that you plan to use during the deposition that might be relevant to such." *Id.* When he explained that he wanted to present the material to straighten the record out, she responded "this in't [sic] the time to straighten the record out, because you will have an opportunity to do that at a later date and time." *Id.* The deposition record reflects that the conversation with Ms. Shields occurred at the end of the deposition:

Q.· Mr. Troya, you understand you are still under oath, correct?

A.· Yes, ma'am.

Q.· The question I asked you before the break was is there anything you have not told me that is important to your claim in this case?

A.· I don't know kind of how to answer that, but I did have some documents that I wanted to go over that were in discovery that you sent me that I felt weren't accurate.· I don't know if this is the time to do that.

Q.· It's not.

A.· Okay.

Q.· If you have objections to what you produced in discovery or how you responded, you can write me a letter, and then I'll respond.

A.· It's not so much that I object to them just being there.· They were untruthful or misleading in nature, some of the things, and I just pulled out what I felt was relevant in that.· But if you say this isn't the avenue to do that, then I guess we can do it in another avenue.

Q.· I would prefer -- well, in terms of the record, this is not the appropriate time to do it, but we can talk a little bit more about it off the record.· So is that -- is that what those documents are, what I produced to you?

A.· Yeah.· These are things that I just went over.

Q.· And then what is in the manila folder?

A.· This is my complaint, Exhibit --

Q.· The written version of it?

A.· No, no.· This is just some notes that I had taken, but they're unrelated to this portion of the -- it's just the complaint and I had some notes.

Q.· Can I see them?

A.· Not really.· But I mean they're immaterial to my testimony.

Q.· Are they relevant to this case?

A.· No, not really.· It's just reminders of how this proceeding is -- how the proceeding goes.

Q.· Okay.· Is there anything relevant to this case in your folder?

A.· Just Exhibit 1.

Q.· Okay.· So the notes that you took are not relevant to this case?

A.· No, ma'am.

Dkt. 89-2 at 42-44.· Whether based on Mr. Troya's version of Ms. Shield's questioning or based on the deposition transcript, the Court finds that the questioning was, objectively speaking, not

threatening in any manner. Objective questions about documents brought to a deposition in a manila folder, either at the beginning or end of the deposition, in the manner asked would not terrify a litigant into not testifying truthfully. Thus, the Court does not credit Mr. Troya's allegation that he felt "threatened."

Nor should Mr. Troya's deposition testimony be excluded because of Mr. Troya's allegation that he did not sleep well due to stress from his capital habeas case and was in a lot of distress. During his deposition, he denied that there was "anything that would interfere with [his] ability to give honest, complete, and accurate answers" to the depositions questions or that there was any reason to think that it was a bad day for a deposition. Dkt. 89-2 at 5 (Troya Dep. 6:13-20).

Having sworn to tell the truth under oath, *id.* (Troya Dep. 6:21-25), Mr. Troya cannot now submit a declaration in the hopes of erasing his prior testimony in its entirety. *See Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018) (citing *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996)) ("As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony.").

Accordingly, where statements in Mr. Troya's declaration or complaint (which was prepared by Purkey, dkt. 89-2 at 32-34 (Troya Dep. 113:22-115:18)) conflict with his deposition testimony, the Court will disregard the contradictory statements and instead credit the deposition testimony. *Dunn*, 880 F.3d at 910 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)) ("where deposition testimony and an affidavit conflict, 'the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken ....'").

### III.    Factual Background

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Troya as the non-moving party with respect to the motion for summary judgment.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### D.    The Parties

Mr. Troya is currently serving a death sentence for murder, armed carjacking, being a felon in possession of a firearm resulting in death, and other convictions.  Dkt. 72-1 at 6-7 (Troya Dep. 14:17-15:9).  He has been incarcerated in the SCU at FCC TH since approximately July of 2009. *Id.* at 5-6 (Troya Dep. 13:23-14:4).  Mr. Troya's claims relate to his medical care at FCC TH after his hemorrhoidectomy on April 11, 2016.

Andrew Rupska is currently employed by the BOP as an Assistant Warden at the Federal Correctional Complex in Butner, North Carolina.  Dkt. 72-2 at ¶ 1.  From April 7, 2013, through November 26, 2017, Mr. Rupska was the Health Services Administrator ("HSA") for FCC TH. *Id.* at ¶ 2.  In his capacity as HSA, Mr. Rupska did not provide direct medical care to inmates unless a medical emergency arose.  *Id.* at ¶ 5.  Rather, he was responsible for implementing and directing the administration of the Health Services Department, which included supervising administrative personnel and overseeing staff scheduling, fiscal management, and records management.  *Id.*  During the relevant time period of the events in the Complaint, Mr. Rupska did not provide direct medical care to Mr. Troya, did not make any decisions regarding Mr. Troya's treatment following his hemorrhoidectomy in April 2016, and does not recall speaking to Mr.

Troya or receiving any emails or other messages from Mr. Troya immediately after his surgery in April 2016. *Id.* at ¶¶ 6-7.

Dr. William Wilson is a medical doctor and has served as the Clinical Director of FCC TH since June 5, 2011. Dkt. 72-3 at ¶¶ 1-2. Other than reviewing and co-signing documents, Dr. Wilson was not directly involved in treating Mr. Troya's constipation immediately following his hemorrhoidectomy on April 11, 2016. Mr. Troya does not recall Dr. Wilson physically seeing him during this period either. Dkt. 72-1 at 36 (Troya Dep. 89:14-22). Dr. Wilson does not recall speaking to Mr. Troya or receiving any emails or other messages from Mr. Troya immediately after his hemorrhoidectomy. Dkt. 72-3 at ¶ 34.

Mr. Troya contends that both Mr. Rupska and Dr. Wilson are responsible because they displayed lack of oversight and supervision. *Id.* at 38-40, 42.

At the time of the allegations in Mr. Troya's Complaint, Heather Mata was a Physician Assistant ("PA"), Susan Porter was a Registered Nurse ("RN"), and Cindy McGee was a Nurse working within the Health Services Department at FCC TH. Dkt. 72-3 at ¶ 7; *see also* Dkt. 72-35 at ¶¶ 1-2.

### E.     FCC TH's Commissary and TRULINCS

Of relevance to this action are two programs at FCC TH: the commissary program and TRULINCS.

FCC TH's commissary program allows inmates to purchase a variety of items, including certain over-the-counter medications. Dkt. 72-37 at ¶¶ 4-5. Inmates are typically allowed to shop at the commissary once a week. *Id.* at ¶ 6. Non-indigent inmates who are prescribed over-the-counter medications that are available for purchase from the commissary from outside providers are typically directed to purchase those medications from the commissary. Dkt. 72-3 at ¶ 35.

Inmates can make special requests to purchase necessary over-the-counter medications from the commissary before their typical time to shop.[4]  Dkt. 72-3 at ¶ 35; *see also* Dkt. 72-37 at ¶ 6.

On April 1, 2016, in the "OTC Medication & Supplements" section of the commissary list for the SCU at FCC TH, there were milk of magnesia (a laxative), stool softener[5], and fiber laxative available for the SCU inmates to purchase.[6]  Dkt. 72-38 (List of Commissary items); *see also* Dkt. 72-37 at ¶ 8.  At that time, the milk of magnesia sold for $2.55, the stool softener sold for $4.45, and the fiber laxative sold for $5.95.  Dkt. 72-38 at 2.

TRULINCS is a computer system through which inmates can exchange electronic mail. Dkt. 72-37 at ¶ 11.  Inmates may use TRULINCS to send messages to a specific staff member.  *Id.* The Bureau of Prison (BOP) maintains inmates' TRULINCS messages in the ordinary course of business.  *Id.* at ¶ 12.  A search of Mr. Troya's TRULINCS messages was run for any messages directed to any of the defendants from April 2016 through August 2016, all of which are attached in Dkt. 72-40.  According to this search, the earliest message directed to any of the individual

---

[4] Mr. Troya disputes Tammy Stewart's statement about an inmate's ability to make special requests to commissary and asserts instead that inmates are not permitted to purchase over-the counter medications through the commissary with the exception of regular commissary purchasing.  Dkt. 86 at 10 (citing dkt. 86-2 (Purkey Decl.) ¶ 7).  Purkey testified that he has never witnessed any inmate being allowed to make special purchases of over-the-counter medications.  Dkt. 86-2 ¶ 7.  Purkey's testimony does not, however, contradict Ms. Stewart's testimony.  Moreover, Purkey's testimony is belied by the fact that Mr. Troya was able to obtain over-the-counter medications on April 14, 2016, outside of his regular shopping days.  *See* dkt. 72-39 at 15 (April 14, 2016, commissary receipt).

[5] Although not pertinent to the claims in this action, the Court notes that "[a] laxative is a substance that you use to help you have a bowel movement. A stool softener is a type of laxative, called an emollient laxative. So, all stool softeners are laxatives, but not all laxatives are stool softeners."  "Stool Softeners vs. Laxatives," Healthline, available at https://www.healthline.com/health/constipation/stool-softeners-laxatives#types (last accessed February 4, 2019).

[6] In paragraph 6 of his "Statement of Material Facts in Dispute," Mr. Troya alleges that laxatives are not sold at the commissary.  Dkt. 86 at 12.  But Mr. Troya's alleged "evidence" for that proposition, a list of purchasable items from the commissary, is contrary to his claim as both milk of magnesia and fiber laxative are listed under "OTC medication and supplements."  Dkt. 86-3 at 3.  Moreover, he acknowledged fiber laxatives were available from the commissary in his deposition.  Dkt. 89-2 at 12 (Troya Dep. 54:18-23).

defendants was an April 25, 2016, message for "mr.A.Rupska" requesting the names of the nurses that did rounds in the SCU between April 11 through 16, 2016. *Id.* at 1. Several messages were directed toward PA Mata, but the earliest was sent on May 2, 2016, regarding his follow-up with his hemorrhoid surgeon. *Id.* at 2. There were no messages directed to Dr. Wilson, RN Porter, or Nurse McGee found during this search. *See generally,* dkt. 72-37 at ¶ 12; dkt. 72-40.[7]

### F. Mr. Troya's Relevant Prior Medical Care

Mr. Troya has a history of hemorrhoid[8] problems dating back to at least 2009. Dkt. 72-3 at ¶ 8; dkt. 72-1 at 8 (Troya Dep. 25:2-17). A hemorrhoidectomy[9] was previously recommended, but Mr. Troya declined the surgery at that time. Dkt. 72-1 at 8-9 (Troya Dep. 25:23-26:12).

On October 29, 2015, Mr. Troya was seen by PA Mata. Dkt. 72-7. He reported that he wanted to be referred to a general surgeon to be re-evaluated for surgery for his hemorrhoids. *Id.* Dr. Brett Guinn evaluated Mr. Troya on December 8, 2015, and recommended an external hemorrhoidectomy. Dkt. 72-8.

---

[7] In paragraph 2 of his "Statement of Material Facts in Dispute," Mr. Troya alleges that Mr. Rupska and Dr. Wilson received correspondences from him. The defendants argue that Mr. Troya cannot rely on his testimony regarding statements from unidentified nurses that they would submit his sick call requests to Mr. Rupska and Dr. Wilson to establish that Mr. Rupska and Dr. Wilson actually received those requests because those statements are hearsay under Fed. R. Evid. 801(c), 802. The defendants' objection is sustained as those nurses' statements are offered to prove the truth of the matter asserted.

Mr. Troya also alleges that Mr. Rupska acknowledged receipt of the correspondence from April 13, 2018, dkt. 86 at 7, but there is no citation to any evidence as required by Local Rule 56-1(e). Accordingly, the Court will not consider this allegation as fact.

[8] "Hemorrhoids … are swollen veins in your anus and lower rectum, similar to varicose veins. Hemorrhoids have a number of causes, although often the cause is unknown. … Hemorrhoids may be located inside the rectum (internal hemorrhoids), or they may develop under the skin around the anus (external hemorrhoids). "Hemorrhoids," Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/hemorrhoids/ symptoms-causes/syc-20360268 (last accessed January 31, 2019).

[9] "A hemorrhoidectomy is surgery to remove internal or external hemorrhoids that are extensive or severe." "Hemorrhoidectomy," UCSF (2018), available at https://colorectal.surgery.ucsf.edu/conditions-- procedures/hemorrhoidectomy.aspx (last accessed January 31, 2019).

### G. Mr. Troya's Hemorrhoidectomy on April 11, 2016

On April 11, 2016, Dr. Mark Lynch performed a four column internal and external hemorrhoidectomy on Mr. Troya at Union Hospital. *See* dkt. 72-11. Mr. Troya was discharged from Union Hospital the same day, with instructions, including the following:

- You may have a small amount of rectal bleeding after going home. You may want to wear a sanitary pad to keep from soiling your clothing.

- Your bowels may not move for a few days. This is normal. If your doctor did not give you a prescription for a stool softener, you may take Milk of Magnesia or an over-the-counter stool softener.

- Drink plenty of fluids to keep the bowels soft. Start out with a soft diet and advance it as tolerated or as instructed per your doctor.

- Take the pain medication as prescribed. If you were not given a pain prescription, you may take Tylenol as needed for pain. Some pain and swelling is normal. Our goal is to keep your pain at a tolerable level. If the pain is not tolerable, contact the doctor.

Dkt. 72-12 at 2. The discharge instructions also included special instructions for "full liquids today," "increase to soft diet tomorrow," "regular in one week," and "see Dr. Lynch next prison office." [10] *Id* at 1. Mr. Troya was discharged with written prescriptions for Hydrocodone and Acetaminophen 7.5 mg/325 mg and Colace 100 mg by mouth every 12 hours. *Id.* at 20. [11]

---

[10] In his "Statement of Material Facts Not in Dispute," Mr. Troya states that "Dr. Lynch mandated that, 'if troya did not have a bowel movement with [sic] 48 to 72 hours after surgery that he be contacted.'" Dkt. 86 at 6. The defendants argue that there is no factual support for this allegation and that Mr. Troya's recounting of Dr. Lynch's alleged statement is inadmissible hearsay under *Fed. R. Evid.* 801(c), 802. The defendants' objection is sustained and Mr. Troya's statement will not be considered by the Court as fact as Mr. Troya offers his recollection of Dr. Lynch's statement to prove the truth of the matter asserted.

[11] Mr. Troya alleges that Dr. Wilson's declaration omitted to clarify that Dr. Lynch prescribed Colace and a liquid and soft diet. Dkt. 86 at 8. But all of these instructions were discussed in Dr. Wilson's declaration, so there is no dispute. *See* dkt. 72-3 at 4. Mr. Troya further states that he was advised by Dr. Lynch that Percocet has possible side effects of constipation. Although not directly addressed, there does not appear to be a dispute that Percocet has side effects of constipation. *See* dkt. 72-41 ("This occurs in addition to the constipating effects of opiate narcotics [such as Percocet.]").

### H.   Mr. Troya's Post-Hemorrhoidectomy Medical Care in April 2016

Upon his return to FCC TH on April 11, 2016, Mr. Troya was evaluated at his cell by RN Susan Porter.  Dkt. 72-35 at ¶ 6; dkt. 72-13; dkt. 72-36.  There is a factual dispute about what happened on April 11, 2016, between Mr. Troya and RN Porter.  The medical records reflect that RN Porter educated Mr. Troya to drink "PLENTY" of fluids, consume a soft diet if possible for the next several days, and resume a regular diet next week.  Dkt. 72-13.  RN Porter testified that she cannot prescribe a soft diet.  Dkt. 72-35 at ¶ 6.  Because only the PA or the Physician can prescribe diets, she educated Mr. Troya on what types of foods he could eat from food service and commissary that meet a soft diet.  *Id.*  RN Porter placed new medication orders for docusate sodium (the generic name for Colace) 100 mg and oxycodone/acetaminophen 5 mg/325 mg with the Pharmacy.  Dkt. 72-13 at 2.

After RN Porter placed the medication orders, RN Porter states that the Pharmacy decided whether to fill those prescriptions.  Dkt. 72-35 at ¶ 7.  RN Porter was aware that stool softeners and laxatives are over-the-counter medications that are available for purchase from the SCU commissary.  Dkt. 72-35 at ¶ 8.  At some point, she advised Mr. Troya that he could purchase stool softeners from the commissary.  *Id.*  She does not recall exactly when this was, but it was during the medication pass.  *Id.*  Mr. Troya knew, as of April 11, that stool softeners were available for purchase from the commissary.  Dkt. 72-1 at 43, 50 (Troya Dep. 117:8-13, 137:7-12).

Mr. Troya contends that, on April 11, the night he returned to Terre Haute, RN Porter came and gave him pain medication and that he then asked about the rest of his medication.  Dkt. 72-1 at 10 (Troya Dep. 35:4-18).  According to Mr. Troya, RN Porter indicated that she did not have other medication for him on her cart or in the chart.  *Id.* (Troya Dep. 35:19-22).  Mr. Troya could not recall if RN Porter said anything else to him at that time.  *Id.* at 10-11 (Troya Dep. 35:23-36:2).

In his Complaint, Mr. Troya stated that he asked RN Porter about the liquid and soft diet ordered by Dr. Lynch, as well as the laxative, but that "Porter unequivocally told Troya that she had no idea about those Post Surgery Orders and that all she was aware of [was] that Dr. Lynch prescribed [ ] the pain medication that she had provided to him." Dkt. 1 ¶ 16. RN Porter apparently told him that he would address any issues about his diet with PA Mata and HSA Rupska.[12] *Id*. Mr. Troya asserts that RN Porter never "schooled" him on what foods he should eat for his liquid and soft diets. Dkt. 86 at 11. Mr. Troya maintains that he saw RN Porter on more than one occasion after this, but he could not identify exactly when; he believed it may have been the morning of April 12. Dkt. 72-1 at 12-15 (Troya Dep. 39:24-40:12, 40:23-41:5, 41:24-42:2). According to Mr. Troya, he asked her where his prescription was, and she again responded that it was not on her cart or in the chart. *Id.* at 14 (Troya Dep. 41:6-17).

On April 14, 2016, three days after the hemorrhoidectomy, Mr. Troya was seen by PA Mata regarding his recent surgery. According to the medical records, Mr. Troya reported that the pain was now better controlled, but that he had not had a bowel movement since the surgery. Dkt. 72-14 at 1. PA Mata noted that Mr. Troya had been using liquid laxative from the commissary without improvement and that he had a current order in for stool softeners. *Id.* Mr. Troya denies

---

[12] In paragraphs 5 and 18 of his "Statement of Material Facts in Dispute," Mr. Troya references evidence, citing dkts. 78 and 79, relating to the protocol for medical diet and treatment received by Dustin Lee Honken, another inmate. However, dockets 78 and 79 relate to the Court's Entry granting motion for extension of time. Mr. Troya also references docket 64, but that entry was Mr. Troya's objections to Dr. Waters' expert report and fails to specifically cite evidence in support of his legal arguments. The Court is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant,* 870 F.3d at 573-74. Thus, any allegations allegedly from or relating to Honken will not be considered by the Court for the purposes of this motion.

Mr. Troya also disagrees with RN Porter's statements about how it was up to the pharmacy whether to fill the prescription, but he fails to specifically rebut her statements with admissible evidence. Local Rule 56-1(f) requires that the "the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that … the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence."

that he was using liquid laxatives at this time or that he reported that he was doing so to PA Mata. Dkt. 72-1 at 18-19 (Troya Dep. 48:18-20, 49:18-21). According to the medical records, Mr. Troya stated that he still had some bleeding, but it was improving. Dkt. 72-14 at 1. Mr. Troya alleges that he told PA Mata that the pain was severe when he was forced to move around, severe cramping and bleeding was occurring, and that he had not been able to pass gas. Dkt. 86 at 11.[13] In any case, PA Mata placed new medication orders for Bisacodyl for his constipation and advised him to use Colace 100 mg BID and that, if he did not have a bowel movement by April 16, he should contact the mid-level provider on call for further orders. Dkt. 72-14 at 2; dkt. 72-1 at 22-23 (Troya Dep. 55:13-56:12).

PA Mata then assisted Mr. Troya with placing an order for stool softener with the commissary. Dkt. 72-1 at 21 (Troya Dep. 53:4-6). Mr. Troya's commissary records indicate that on April 12, 2016, the day after the hemorrhoidectomy, his trust fund account was debited for 28 items sold, including Three Musketeers bars and two "Hot/Spicy Vegetable Ramen," leaving him a balance of $406.42. Dkt. 72-39 at 16. Two days later, on April 14, 2016, Mr. Troya had an account balance of $404.82; his account was debited $18.85 for four items—Aleve, 24 count; Tucks medicated pads; hemorrhoid ointment; and stool softener—leaving him a balance of $385.97. *Id.* at 15; dkt. 72-1 at 20-21 (Troya Dep. 52:11-53:19).

On April 16, 2016, at 12:59 p.m., Nurse Cindy McGee completed an Administrative Note regarding an encounter with Mr. Troya. Dkt. 72-15. According to the Note, Mr. Troya was seen standing at a cell door during noon medication pass in the SCU and stated, "PA said to call her

---

[13] In paragraph 6 of his "Statement of Material Facts in Dispute," Mr. Troya asserts that PA Mata told him that "yes, you are right, it looks as if someone dropped the ball on providing you with Dr. Lynch's Post-Surgical Orders." Dkt. 86 at 11 (citing dkt. 1 ¶ 18). The defendants object to Mr. Troya's reliance on PA Mata's statement to establish the truth of the matter asserted – that someone dropped the ball – as inadmissible hearsay. The defendants' objection under *Fed. R. Evid.* 801(c), 802 is sustained as that statement is offered to prove the truth of the matter asserted.

today if I haven't had a bowel movement. I haven't had a bowel movement since my surgery." *Id.*

at 1. Mr. Troya apparently otherwise denied having abdominal pain, difficulty urinating, or any

other complaints. *Id*. Mr. Troya asserts that he did in fact complain of abdominal pain, cramping,

burning, and nausea. Dkt. 86 at 12.[14]

Nurse McGee consulted with PA Mata, who gave a verbal voice order to give Mr. Troya

half of a bottle of magnesium citrate, and, if he had not defecated by this evening, to give Mr.

Troya the second half of the bottle. Dkt. 72-15 at 1. Nurse McGee offered the medication to Mr.

Troya, but Mr. Troya was in the recreation area at this time, which did not have a bathroom, and

apparently refused the medication. There is some dispute as to what transpired in this interaction

as Mr. Troya denies refusing the medication, but there is no dispute that Mr. Troya did not obtain

the magnesium citrate medication from Nurse McGee at that time. Dkt 72-15 at 1; dkt. 86 at 12-

13.

Nurse McGee placed a new medication order for Citrate of Magnesia oral solution, a half

bottle to be given at the evening pill line, and the other half later that same night if there were no

results. Dkt. 72-15 at 1. She also allegedly advised Mr. Troya he would get the magnesium citrate

later. *Id*. Mr. Troya received the first half of the bottle around 4:00 p.m. that day and the other

half later that night. Dkt. 72-1 at 30-32 (Troya Dep. 66:14-19, 71:10-13, 74:3-13). Mr. Troya

alleges that RN Porter brought the first half bottle of magnesium citrate. Dkt. 86 at 13; dkt. 72-1

at 30 (Troya Dep. 66:20-23). Mr. Troya also told Nurse Porter that he was feeling faint,

---

[14] Citing testimony from Purkey, Mr. Troya asserts that defendant Mr. Rupska stated that when inmates complain about pain or symptoms, medical does not take their word for it because inmates lie and the nurse and attending medical staff use their own observations in triage notes. *See* dkt. 86 at 12 (citing dkt. 86-2 ¶ 9). As previously explained, the Court is not considering paragraph 9 of Purkey's declaration. Thus, there is no support for Mr. Rupska's statement. In any case, Mr. Rupska's statement is not relevant or material to this case. The Court construes all of the evidence in this motion in the light reasonably most favorable to Mr. Troya.

disoriented, and in pain after drinking the first half bottle. Dkt. 86 at 13 (citing dkt. 1 ¶ 22). Nurse Porter advised Mr. Troya to lie down and allow the laxative to do its work. *Id.* About two hours later, Nurse Porter returned with the second half bottle of magnesium citrate. *Id.* He again told Nurse Porter that he was not feeling well. *Id.* She reiterated that he should lie down and allow the magnesium citrate to do its work. *Id.* (citing dkt. 1 ¶ 22). Later, after he took the second half of the bottle, he threw up. Dkt. 72-1 at 32 (Troya Dep. 74:14-18).

There is some dispute as to what happened later that night. According to the medical records, later that same day at 7:00 p.m., RN Kelly Scamihorn evaluated Mr. Troya in the medical exam room in the SCU due to his complaints of pain. Dkt. 72-16. On exam, blood was noted in Mr. Troya's rectum and a small amount of blood was noted in his boxers, but there was no active bleeding and Mr. Troya denied tenderness on palpation of the abdomen and pain in his abdomen. *Id.* at 2. Mr. Troya reported not having a bowel movement since his surgery and that he drank the magnesium citrate with no relief. *Id.* RN Scamihorn noted that Mr. Troya appeared to be in pain with an elevated blood pressure and pulse and being diaphoretic. *Id.* The on-call doctor was notified, and new orders were received to send Mr. Troya to the emergency room for further treatment. *Id.* Mr. Troya was then transferred to Union Hospital. Dkt. 72-3 at ¶ 18.

According to Mr. Troya, after he drank the second bottle (sometime before 7:00 p.m.), he blacked out for ten to fifteen minutes from the pain and cramping. Dkt. 86 at 13 (citing dkt. 1 ¶ 23). Mr. Troya asserts that he was found lying unconscious in his own vomit and blood. *Id.* at 14. He then had to drag himself to the door to be handcuffed. *Id.*

Shortly after 9:00 p.m. on April 16, 2016, Mr. Troya was admitted to and triaged at Union Hospital. Dkt. 72-17. Mr. Troya reported that he had a hemorrhoidectomy five days ago and had yet to have a bowel movement. *Id.* He further stated that that he had 15 meals since the surgery

and had taken stool softeners, fiber drinks, and laxatives, but his symptoms were not alleviated.[15]
*Id.*

At Union Hospital[16], a CT scan of Mr. Troya's abdomen and pelvis was performed. Dkt. 72-18. It revealed moderate constipation and gas and formed stool distally in the colon extending down to the rectum and liquid stool more proximally. *Id.* at 2. There was no small bowel dilatation and no focal inflammatory changes. *Id.* There was no evidence of free fluid or free air. *Id.*

The following day, Mr. Troya reported that he had been taking Percocet for his post-hemorrhoidectomy pain and had started the stool softener on his own on Tuesday (April 12) with no results. Dkt. 72-19 at 2. At Union Hospital, Mr. Troya was diagnosed with moderate constipation and treated with sodium chloride and laxatives, including GoLYTELY, which he indicated was the most effective. Dkt. 72-1 at 33 (Troya Dep. 84:6-22); dkt. 72-20. No further surgery or manual fecal disimpaction was required to relieve Mr. Troya's constipation. Dkt. 72-1 at 33-34 (Troya Dep. 84:23-85:2); dkt. 72-20. Mr. Troya was discharged from Union Hospital and returned to FCC TH on April 20, 2016. Dkt. 72-20 at 2-6.

Upon his return to FCC TH, Mr. Troya was seen at his cell. Mr. Troya reported that he was in some discomfort from the surgery and had several bowel movements the previous day, but that he was feeling better since he was able to have a bowel movement. Dkt. 72-21 at 1. Mr. Troya was advised to drink plenty of fluids, eat his meals, and inform staff if had had any problems.

---

[15] Mr. Troya denies that he told anyone at Union Hospital that he had had fifteen meals since his April 11 surgery or that he had been taking stool softeners, fiber drinks and laxatives. Dkt. 86 at 14. However, Mr. Troya does not provide any evidence to refute the medical records at Union Hospital. *See* Local Rule 56-1(e). However, this dispute is not material to Mr. Troya's claims in this action.

[16] Mr. Troya asserts that Dr. Imad George, a doctor at Union Hospital, made certain statements about Mr. Troya's treatment and ordered certain pain medication. *See* dkt. 86 at 15, 17. There are no medical records supporting Mr. Troya's allegations. The defendants argue that Dr. George's statements, which are presented solely through Mr. Troya's testimony, is inadmissible hearsay. The defendants' objection, under *Fed. R. Evid.* 801(c), 802, is sustained.

*Id.* New medication orders were submitted for ibuprofen, polyethylene glycol powder, and docusate sodium capsule. *Id.* at 2.

On April 22, 2016, Mr. Troya was seen again by medical staff. He reported bleeding during bowel movements, but that his stools were soft now. Dkt. 72-22 at 1-2. Three days later, on April 25, 2016, Mr. Troya reported he was having semi-hard stools and requested Miralax. Dkt. 72-23. A new order was submitted for polyethylene glycol powder. *Id.* at 1.

## I.       Expert Opinion of Dr. Joshua Waters[17]

Dr. Joshua Waters is a licensed surgeon who also serves as an assistant professor in the Department of Surgery within the Indiana University School of Medicine. Dkt. 72-41 at ¶ 1. He actively practices colon and rectal surgeries at Methodist Hospital and the Richard A. Roudebush VA Medical Center in Indianapolis, Indiana. *Id.*

Dr. Waters was retained by the defendants to review Mr. Troya's complaint and the relevant medical care for Mr. Troya. *Id.* at ¶ 3. Based on his clinical experience and interpretation of the medical evidence provided to him, Dr. Waters did not find evidence to support a breach in the typical postoperative standard of care after the excisional hemorrhoidectomy in Mr. Troya's case. *Id.* at ¶ 6.

Dr. Waters noted that constipation is not a rare or life-threatening complication after excisional hemorrhoidectomy and that the anal pain and spasm from the operation may contribute

---

[17] Mr. Troya disagrees with Dr. Waters' expert opinion. *See* dkt. 86 at 16. In particular, Mr. Troya focuses on Dr. Waters' failure to critique Dr. Lynch's post-surgical medical orders. However, the propriety of Dr. Lynch's medical orders is not in dispute in this action. Rather, Mr. Troya's claim is whether Dr. Lynch's medical orders were properly followed. Additionally, Mr. Troya has not provided any expert opinion to rebut Dr. Waters' expert opinions. Nor is Mr. Troya qualified to provide medical opinions to refute Dr. Waters' expert opinions. *See Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) ("A nonexpert is not permitted to give expert testimony. Wholly lacking in medical knowledge as he was, the plaintiff was incompetent to testify on the causal relation if any between exercise and healthy gums."); *see also Fed. R. Evid.* 701, 702.

to difficult defecation.  *Id.* at ¶ 7.  This occurs in addition to the constipating effects of opiate narcotics, which are commonly used to treat post-hemorrhoidectomy pain.  *Id.*  According to Dr. Waters, all patients should be counseled that 7-14 days of pain, particularly during defecation, is to be expected after excisional hemorrhoidectomy.  *Id.*  A combination of behavioral, dietary, and medical interventions may be utilized to prevent or treat postoperative constipation, including temporary dietary alterations (i.e. increased fiber intake), adequate fluid intake, and use of stool softeners or stimulant laxatives.  *Id.*

In post-hemorrhoidectomy patients, Dr. Waters does not routinely initiate laxatives or stool softeners postoperatively.  *Id.* at ¶ 8.  Rather, Dr. Waters counsels the patient on the signs of constipation and recommends initiating over-the-counter laxatives on an as needed basis if signs of constipation become evident.  *Id.*  As Dr. Waters explained, overly aggressive laxative use in the postoperative setting may lead to frequent or loose stools, which may exacerbate pain associated with frequent toileting.  *Id.*  Should constipation occur, a step-up approach of increasingly aggressive bowel-stimulating or purgative medications may be used.  *Id.*

Dr. Waters recounted that, following the hemorrhoidectomy, Mr. Troya was provided written and verbal instructions on avoidance of constipation, which included drinking plenty of fluids, utilization of a liquid/soft diet, and utilization of stool softeners or laxatives.  *Id.* at ¶ 9.  The instructions detailed that lack of bowel movement for a few days after the operation may be normal.  *Id.* Dr. Waters opined that it is not standard of care to prescribe a liquid or soft diet following excisional hemorrhoidectomy; this represents individual surgeon preference rather than typical practice. *Id.*

Based on Dr. Water's review, on the third postoperative day, when Mr. Troya had not had bowel function, bisacodyl, a stimulant laxative, was provided, with plans to re-evaluate if no

further bowel activity was noted within the next two days.  *Id.* at ¶ 11.  At that time, Mr. Troya was escalated to magnesium citrate, which is a more aggressive osmotic laxative utilized to stimulate defecation.  *Id.*  When Mr. Troya became symptomatically worsened, he was appropriately evaluated and transferred to an emergency department for further management.  *Id.* at ¶ 12.  At that time, he was noted to have constipation not requiring surgical disimpaction and given purgative bowel preparation with ultimate resolution of the issue.  *Id.*  Dr. Waters would not consider this a serious nor life-threatening postoperative complication after hemorrhoidectomy, as Mr. Troya did not require surgical intervention or any secondary procedure to address the constipation.  *Id.*  Dr. Waters further concluded that there do not appear to be any long-lasting or permanent anatomical, symptomatic, or functional consequences noted in the medical record.  *Id.* at ¶ 13.

## IV.    Discussion

Mr. Troya alleges that the defendants were deliberately indifferent to his serious medical needs post-hemorrhoidectomy under the Eighth Amendment.  Specifically, he argues that when he returned to the prison after the surgery, the defendants ignored Dr. Lynch's post-surgery medical orders to provide him with Colace, stool softeners, and liquid and soft diets, causing him to be constipated for many days and to have to be re-admitted to Union Hospital after a severe puking and bleeding episode.

The defendants seek summary judgment on all Eighth Amendment claims against them.  Dkt. 72.  They argue that they were not deliberately indifferent because Mr. Troya did not suffer from a serious medical need and the defendants were not deliberately indifferent to his medical condition.  They also argue that they are entitled to qualified immunity.

### A.  Eighth Amendment Deliberate Indifference Standard

At all times relevant to Mr. Troya's claims, he was a convicted inmate.  Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.  *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").  Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk.  *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).  Something more than negligence or even malpractice is required.  *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (citing *Estelle*, 429 U.S. at 106; *McGee v. Adams*, ,721 F.3d 474, 481 (7th Cir. 2013)).  "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim."  *Id.* (citing *Farmer*, 511 U.S. at 836-38).  A successful *Bivens* plaintiff must also establish not only that a state actor violated his constitutional rights, but that the violation caused the plaintiff injury or damages.  *Roe v. Elyea*, 631 F.3d 843, 846 (7th Cir. 2011) (citation omitted).

"[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious

risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations omitted).

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). "Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted). However, "[a] jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016).

### B. Objectively Serious Medical Need Standard

The parties dispute whether Mr. Troya was suffering from an objectively serious medical need prior to the evening of April 16, 2016, when he was re-admitted to Union Hospital. The

defendants argue that Mr. Troya was suffering from moderate constipation and did not display severe symptoms prior to April 16, 2016. Mr. Troya focuses on the evening of April 16, 2016, when he was allegedly found unconscious on the floor of his cell in a pool of his own vomit and blood. He also argues that because he had a physician note post-hemorrhoidectomy, his medical condition was necessarily objectively serious because it was "diagnosed" and had a "mandated treatment."

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotations and citations omitted). A medical condition that causes pain can be serious without being life-threatening, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (finding muscle spasms and accompanying back pain objectively serious), but "this is not to say, however, that every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim," *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997). As the Seventh Circuit explained,

> Deliberately [] ignor[ing] a request for medical assistance has long been held to be a form of cruel and unusual punishment, but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized. A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue--the sorts of ailments for which many people who are not in prison do not seek medical attention--does not by its refusal violate the Constitution. The Constitution is not a charter of protection for hypochondriacs. But the fact that a condition does not produce "objective" symptoms does not entitle the medical staff to ignore it. … Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition.

*Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (internal citations omitted). Even if an injury

may later turn out to not be serious, if the injuries ***appear*** to be serious, prompt medical attention

must be provided. *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).

The following is a non-exhaustive list of instances where the Seventh Circuit has held that

a condition was not a serious medical need under the Eighth Amendment:

- Vomiting was not a serious medical need, although the inmate's heart condition, CHF, was. *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010);

- A split lip and a swollen cheek did not rise to the level of an objectively serious medical need. *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006);

- Breathing problems, chest pains, dizziness, sinus problems, headaches, and a loss of energy as a result of exposure to second-hand smoke was not an objectively serious injury or medical need that amounts to a denial of "the minimal civilized measure of life's necessities." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (quoting *Farmer*, 511 U.S. at 834);

- A toe whose toenail had been removed did not constitute a serious medical need, although it was, no doubt, painful. *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996);

- A mild case of asthma (which was allegedly exacerbated by second-hand tobacco smoke) did not rise to the level of seriousness sufficient to support a claim for relief. *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996);

- A one-inch laceration to an arrestee's temple, that was neither deep enough or long enough to require stitches, and a scraped elbow did not require prompt medical attention under the Eighth Amendment. *Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991); and

- Failure to treat a common cold did not constitute deliberate indifference to a serious medical need. *Gibson v. McEvers*, 631 F.2d 95 (7th Cir. 1980).

As to an isolated episode of moderate constipation, many other district courts have

considered the question and, absent other symptoms, found it to not be a serious medical condition

under the Eighth Amendment. *See Foster v. Enenmoh*, No. 1:08-cv-01849-LJO-SKO PC, 2013

WL 3991978, at *9 (E.D. Cal. Aug. 1, 2013) ("The Court would have no difficulty concluding that

isolated bouts with constipation do not rise to the level of a serious medical need . . . ."); *Stanfield*

*v. Thompson*, No. 4:12CV-P54-M, 2013 WL 899423, at *10 (W.D. Ky. Mar. 8, 2013) (finding that

plaintiff's complaints of constipation did not rise to a serious medical need when there is no indication that the constipation caused any harm to plaintiff other than some minor pain and discomfort); *Adams v. McCoy*, No. 11-0129-BAJ, 2012 WL 6694049, at *6 (M.D. La. Dec. 21, 2012) (holding that the plaintiff's complaints regarding constipation and ear pain, without more, do not constitute serious medical needs which support a finding of deliberate indifference); *Williams v. Mustafa*, No. 08-10197, 2009 WL 483134, at *15 (E.D. Mich. Feb. 24, 2009) (holding that plaintiff's allegations that he suffered from stomach pains and chronic constipation do not rise to the level of a serious medical need); *Moy v. Evans*, No. 06-272-GPM, 2007 WL 315088, at *2 (S.D. Ill. Jan. 31, 2007) (finding that plaintiff did not demonstrate a serious medical need when he complained of constipation and accompanying pain, but did not offer any information regarding a diagnosis or condition); *Webb v. McKnight*, No. Civ.A. 7:06CV00734, 2006 WL 3761382, at *2 (W.D. Va. Dec. 20, 2006), *affirmed*, 225 F. App'x 117 (5th Cir. 2007) (determining that prisoner's complaints of indigestion, constipation, headaches, occasional vomiting, and emotional distress were not sufficiently serious to rise to the level of an Eighth Amendment violation); *Ross v. McGinnis*, No. 00-CV-0275E(SR), 2004 WL 1125177, at *10 (W.D.N.Y. Mar. 29, 2004) (concluding that plaintiff's complaints of abdominal pain, vomiting, heartburn, constipation, body odor, and extreme body heat did not constitute a serious medical need).

Instead, district courts have only found constipation to be a serious medical condition where it was chronic in nature and was accompanied by severe pain and other more alarming symptoms. *See Spar v. Mohr,* No. 2:14-cv-546, 2015 WL 5895914, at *7-8 (S.D. Ohio Oct. 9, 2015) (collecting cases and concluding that plaintiff's chronic constipation, which caused severe abdominal pain, chills, and vomiting, constituted a serious medical need); *Bourgoin v. Weir*, No. 3:10cv391 (JBA), 2011 WL 4435695, at *7 (D. Conn. Sept. 23, 2011) (concluding that plaintiff

suffered from an objectively serious medical condition when he had chronic constipation and his records reflected severe abdominal pain, fecal blockage, and significant weight loss).

### C.  Mr. Troya's Constipation Post-Hemorrhoidectomy

The claims in this case are whether certain FCC TH employees appropriately followed Dr. Lynch's medical orders after Mr. Troya returned from his hemorrhoidectomy and treated Mr. Troya's constipation.  The claims are not related to whether Mr. Troya's hemorrhoids were properly diagnosed and treated.  Nor are the claims related to whether FCC TH employees reacted appropriately when Mr. Troya was found in a pool of vomit and blood on the evening of April 16, 2016.

On April 11, after his hemorrhoidectomy, Mr. Troya was told to expect to have a small amount of rectal bleeding after going home and that it was normal for him to suffer from constipation for a few days.  Dkt. 72-12 at 2.  He was also advised to drink lots of fluids to keep his bowels soft.  Mr. Troya does not contend that he was suffering from constipation at this point. When RN Porter saw him that day, she noted that he was "upright and ambulatory," and that while he was pale, he was able to make all his wants and needs known.  Although Mr. Troya was expected to have constipation, which is a diagnosis and has an identifiable name, and was provided a treatment to handle the constipation, that does not mean the anticipated constipation was a "serious medical need."  Not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez*, 111 F.3d at 1372.  Nor is any ailment with a diagnosis and for which a "treatment" available necessarily a "serious medical need."  For example, a failure to treat a common cold, for which one would generally take medication, does not constitute deliberate indifference to a serious medical need.  *Gibson*, 631 F.2d at 98.  In this case, as of April 11, 2016, where there were no symptomatic complaints from

Mr. Troya and there was an expectation of constipation post-surgery, no reasonable jury would find Mr. Troya's condition to be "objectively serious."

His next interaction was on April 14, 2016, three days after the hemorrhoidectomy, with PA Mata, to whom he reported that he was constipated and feeling severe pain, cramping, and bleeding when he was moving around. Even at this stage, no reasonable jury would find Mr. Troya's condition to be "objectively serious" when his isolated incident of constipation was expected post-surgery. Dr. Waters opined that "[c]onstipation is not a rare or life threatening complication after excisional hemorrhoidectomy." Dkt. 72-41 at 2. Dr. Waters further notes that with "post-hemorrhoidectomy patients, [he] do[es] not routinely initiate laxatives or stool softeners postoperatively. Rather, [he] counsels the patient on the signs of constipation and recommend initiating over-the-counter laxatives on an as needed basis if signs of constipation become evident." *Id.* at 2-3.

By April 16, 2016, Mr. Troya was complaining of abdominal pain, cramping, burning, and nausea and told Nurse McGee that he was constipated and had not passed any stool in five days. Later, he was found in a pool of vomit and blood. At this juncture, a reasonable jury would find that a person lying passed out in a pool of vomit and blood was suffering from an objectively serious medical need, but this occurred after the claims at issue in this case – Mr. Troya does not allege that his new condition was not taken seriously at this point.

Once Mr. Troya was back at Union Hospital, a CT scan showed that he had only moderate constipation. Dkt. 72-19. However, no surgery or manual fecal disimpaction was required to relieve his constipation. Accordingly, Dr. Waters opined that Mr. Troya's condition was not serious or life-threatening. Dkt. 72-41 ¶ 12.

Thus, no reasonable jury would find that Mr. Troya's constipation prior to, or after, the evening of April 16 was "objectively serious" where he displayed no significant symptoms other than a short period of expected constipation and growing pain and discomfort related to the constipation, where his constipation was verified through a CT scan to be moderate, and where his treatment at Union Hospital ultimately did not require surgery or manual fecal disimpaction.

Furthermore, even if the Court were to assume, for purposes of argument only, that Mr. Troya has indeed established an objectively serious medical need after his hemorrhoidectomy, Mr. Troya must still demonstrate that defendants were deliberately indifferent to any objectively serious medical need.

### D. Claim against Dr. William Wilson

Mr. Troya alleges that Dr. Wilson was deliberately indifferent to his constipation post-hemorrhoidectomy. Dkt. 86 at 18. Specifically, Mr. Troya alleges Dr. Wilson is liable in a supervisory capacity and because he was aware of his condition based on the correspondences Mr. Troya sent to Dr. Wilson. *Id.*

First, as explained above in Section IV(C), Mr. Troya was not suffering from a serious medical condition in the days leading up to April 16, 2016. Moreover, Mr. Troya has failed to show that Dr. Wilson even "knew about [Mr. Troya]'s condition and the substantial risk of harm it posed." *Farmer*, 511 U.S. at 834 (deliberate indifference occurs when an official "knows of and disregards an excessive risk to inmate health or safety; the official must *both be aware of facts* from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*.") (emphasis added). Even though Mr. Troya has alleged that he sent correspondences to Dr. Wilson through various unidentified nurses, there is no evidence that Dr. Wilson actually read Mr. Troya's communications or had any subjective awareness of Mr. Troya's

condition. To the contrary, there is evidence that Dr. Wilson was not aware of Mr. Troya's communications. Dkt. 72-3 at ¶ 34. Nor is Dr. Wilson liable for the actions of his subordinates. *See Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly."). Mere "knowledge of a subordinate's misconduct is not enough for liability." *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc). Indeed, "inaction following receipt of a complaint about someone else's conduct is [insufficient]." *Estate of Miller by Chassie v. Marberry*, 847 F. 3d 425, 428 (7th Cir. 2017); *see Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right."). Accordingly, summary judgment on this issue for Mr. Troya is denied and for Dr. Wilson is granted.

### E. Claim against HSA Andrew Rupska

Similar to his claim against Dr. Wilson, Mr. Troya alleges that Mr. Rupska was deliberately indifferent to his constipation post-hemorrhoidectomy. Dkt. 86 at 18. Specifically, Mr. Troya alleges Mr. Rupska is liable in a supervisory capacity and because he was aware of his condition based on the correspondences Mr. Troya sent to Mr. Rupska. *Id.*

First, as explained above in Section IV(C), Mr. Troya was not suffering from a serious medical condition in the days leading up to April 16, 2016. Moreover, Mr. Troya has failed to show that Mr. Rupska "knew about [Mr. Troya]'s condition and the substantial risk of harm it

posed." *Farmer*, 511 U.S. at 834. Even though Mr. Troya has alleged that he sent correspondences to Mr. Rupska through various unidentified nurses, there is no evidence that Mr. Rupska actually read Mr. Troya's communications or had any subjective awareness of Mr. Troya's condition. To the contrary, there is evidence that Mr. Rupska was not aware of Mr. Troya's communications. Dkt. 72-2 at ¶¶ 6-7. Nor is Mr. Rupska liable for the actions of his subordinates. *See Horshaw*, 910 F.3d at 1029. Accordingly, summary judgment on this issue for Mr. Troya is denied and for Mr. Rupska is granted.

### F.     Claim against PA Heather Mata

Mr. Troya's claim against PA Mata relates to her failure to respond to his correspondences about his diet and her interaction with him on April 14. PA Mata also gave the verbal voice order to Nurse McGee on the afternoon of April 16 for Mr. Troya to take two half bottles of magnesium citrate.

First, as explained above in Section IV(C), Mr. Troya was not suffering from a serious medical condition prior to his puking and bleeding in his cell the evening of April 16. Even though Mr. Troya has alleged that he sent correspondences to PA Mata regarding his failure to get a soft diet, there is no evidence that PA Mata ever received these communications, actually read Mr. Troya's communications, or had any subjective awareness of Mr. Troya's lack of a soft diet. Thus, she cannot be deliberately indifferent for failing to provide him with a liquid or soft diet.

In any event, she did try otherwise to address his complaints. When PA Mata saw Mr. Troya on April 14, because he informed her that he was constipated, she assisted him by placing a special commissary order of 24 count of Aleve (for pain presumably), Tucks medicated pads (for rectal bleeding), hemorrhoid ointment, and stool softener. When she was informed, two days later, that Mr. Troya was still constipated, she approved a voice order for him to take a more aggressive

laxative – mag citrate.  The evidence reflects that PA Mata did not disregard Mr. Troya's medical need and instead appropriately provided him with an escalating level of medication to assist with the constipation.  Accordingly, for any of the above reasons, PA Mata is entitled to summary judgment on Mr. Troya's Eighth Amendment claim against her.

### G.        Claim against RN Susan Porter

Mr. Troya's claim against RN Porter relates to his interactions with her on April 11, after he returned from his surgery, and when she provided him with two half bottles of magnesium citrate on April 16.

First, as explained above in Section IV(C), Mr. Troya was not suffering from a serious medical condition prior to his puking and bleeding in his cell the evening of April 16.  The crux of Mr. Troya's claims in this case is that he did not receive liquid and soft diet and stool softeners prescribed by Dr. Lynch.  According to Mr. Troya's version of his interaction with RN Porter on April 11, "[RN] Porter unequivocally told Troya that she had no idea about those Post Surgery Orders and that all she was aware of [was] that Dr. Lynch prescribed was the pain medication that she had provided to him."  Dkt. 1 ¶ 16.  When he explained the necessity of the soft diet and laxatives, she told him to address his concerns to PA Mata and HSA Rupska.  *Id*.  RN Porter testified that she cannot prescribe a soft diet.  Dkt. 72-35 ¶ 6.  Under this version of the facts, RN Porter was not deliberately indifferent to Mr. Troya's medical needs where she was unaware of Dr. Lynch's orders and where she directed Mr. Troya to bring his concerns to individuals with the authority to prescribe the soft diet.[18]

_____

[18] According to RN Porter's version of the facts, which are supported by the medical record, she was aware of Dr. Lynch's orders and properly advised Mr. Troya to drink lots of fluid and what food ideas would be appropriate for a soft diet.  She also testifies that she entered orders for the Colace (the stool softener).  Dkt. 72-35 ¶ 6.  Under RN Porter's version of the facts, RN Porter was not deliberately indifferent to Mr. Troya's medical needs where she carried out Dr. Lynch's orders.

RN Porter also provided two half bottles of magnesium citrate to Mr. Troya on April 16 in an escalation of medication to assist with his constipation. Mr. Troya states that he was feeling faint, disoriented, and in pain after taking the magnesium citrate, but that RN Porter told him to lie down and allow the laxative to do its work. There is no evidence that RN Porter was deliberately indifferent to Mr. Troya's medical needs here. She was attempting to assist with his constipation problem and although he felt unwell, the evidence supports that she felt the laxative was doing its work. It was not her responsibility to second-guess the medical judgment of PA Mata and Nurse McGee in entering the orders for the magnesium citrate especially where there was nothing that raised any obvious risks of harm to Mr. Troya. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."); *Pyles*, 771 F.3d at 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances.").

Accordingly, for any of the above reasons, RN Porter is entitled to summary judgment on Mr. Troya's Eighth Amendment claim against her.

### H. Claim against Nurse Cindy McGee

Mr. Troya's claim against Nurse McGee relates to the afternoon of April 16, when Nurse McGee attempted to provide a half bottle of magnesium citrate to Mr. Troya while he was in recreation. The parties disagree as to what transpired, but it is undisputed that he did not take the bottle of magnesium citrate at that time, but received the magnesium citrate about two hours later.

First, as explained above in Section IV(C), Mr. Troya was not suffering from a serious medical condition prior to his puking and bleeding in his cell the evening of April 16. However, even if he was suffering from a serious medical condition when he interacted with Nurse McGee, he fails to show that she was deliberately indifferent to his serious medical need. Rather, the evidence suggests that Nurse McGee did not disregard Mr. Troya's medical need. Because Mr. Troya was still constipated, she made arrangements for him to take a more aggressive osmotic laxative used to stimulate defecation. She also entered orders that if the first half bottle did not work, Mr. Troya was to be given the second half of the bottle. Mr. Troya does not allege that he was harmed by the two-hour delay in taking the stool softener. *See Williams v. Liefer,* 491 F.3d 710, 715 (7th Cir. 2007) (stating that plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm"). Not that he could in light of Dr. Water's unrebutted expert testimony relating to the post-operative treatment and the hospital finding of only moderate constipation. As explained above, Mr. Troya "is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes*, 112 F.3d at 267. Accordingly, for any of the foregoing reasons, Nurse McGee is entitled to summary judgment on Mr. Troya's Eighth Amendment claim against her.

## I.     Qualified Immunity

The defendants argue that to the extent Mr. Troya's constitutional rights were violated or that the defendants personally acted with deliberate indifference towards him, they are all entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). Analysis of the qualified immunity defense requires a consideration of: (1) whether the plaintiff's constitutional rights were violated and (2) whether the right clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

For the reasons explained above, there was no constitutional violation, so a qualified immunity defense is not necessary. *See Flournoy v. City of Chi.*, 829 F.3d 869, 877 n.10 (7th Cir. 2016) ("The defendants alternatively argue that we should affirm based on qualified immunity. Because we uphold the jury's verdict that no constitutional violation occurred, we do not reach this alternative argument.").

## V. Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 523 U.S. 574, 600 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operates effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Because Mr. Troya has not identified a genuine issue of material fact as to his claims in this case, and because he did not suffer from a serious medical condition, and/or because his condition was not disregarded by the defendants, the defendants are entitled to judgment as a matter of law. Therefore, the defendants' motion for summary judgment, dkt. [72], is **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:   2/11/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution:

DANIEL A TROYA
75817-004
TERRE HAUTE - USP
TERRE HAUTE U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
Gina.Shields@usdoj.gov